BARRY SAUNDERS ET AL. *v.* BURTON
FIRTEL ET AL.

BARRY SAUNDERS *v.* BURTON
FIRTEL ET AL.

BARBUR ASSOCIATES, LLC *v.* ADCO MEDICAL
SUPPLIES, INC.
(SC 18309)

Rogers, C. J., and Norcott, Vertefeuille, Zarella and McLachlan, Js.

Argued April 21—officially released September 22, 2009

*Arnold M. Potash*, for the appellants (defendant Burton Firtel et al.).

*Jonathan S. Bowman*, with whom was *Rachel A. Pencu*, for the appellees (plaintiff Barry Saunders et al.).

*Opinion*

ZARELLA, J. This appeal[1] arises out of three separate actions[2] initiated by the plaintiff, Barry Saunders,[3] against the defendants, Burton Firtel, Adco Medical

---

[1] The defendants appealed from the judgments of the trial court to the Appellate Court. We transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] The trial court consolidated the three separate actions before trial. We note that no appeal has been taken in the third case, *Barbur Associates, LLC* v. *Adco Medical Supplies, Inc.*

[3] Although Saunders has asserted both individual and derivative claims in the three underlying actions; see footnote 11 of this opinion; the only causes of action that are at issue in this appeal are those that Saunders asserted solely in his individual capacity. Therefore, all references to the plaintiff in this opinion are to Barry Saunders.

Supplies, Inc. (Adco), and Barbur Associates, LLC (Barbur),[4] in which the plaintiff, a former employee of Adco and a member and 50 percent interest holder in Barbur, sought to recover unpaid wages and double damages from Adco under General Statutes §§ 31-71c[5] and 31-72,[6] and a judicial dissolution and winding up

[4] The plaintiff named Norma Firtel, the wife of Burton Firtel, as a defendant in one of the underlying actions. See footnote 11 of this opinion. Norma Firtel is not a party to this appeal. All references to Firtel in this opinion are to Burton Firtel, and we hereinafter refer to Burton Firtel, Adco and Barbur collectively as the defendants, and individually by name when appropriate.

[5] General Statutes § 31-71c provides: "(a) Whenever an employee voluntarily terminates his employment, the employer shall pay the employee's wages in full not later than the next regular pay day, as designated under section 31-71b, either through the regular payment channels or by mail.

"(b) Whenever an employer discharges an employee, the employer shall pay the employee's wages in full not later than the business day next succeeding the date of such discharge.

"(c) When work of any employee is suspended as a result of a labor dispute, or when an employee for any reason is laid off, the employer shall pay in full to such employee the wages earned by him not later than the next regular pay day, as designated under section 31-71b."

[6] General Statutes § 31-72 provides: "When any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive, or fails to compensate an employee in accordance with section 31-76k or where an employee or a labor organization representing an employee institutes an action to enforce an arbitration award which requires an employer to make an employee whole or to make payments to an employee welfare fund, such employee or labor organization may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court, and any agreement between him and his employer for payment of wages other than as specified in said sections shall be no defense to such action. The Labor Commissioner may collect the full amount of any such unpaid wages, payments due to an employee welfare fund or such arbitration award, as well as interest calculated in accordance with the provisions of section 31-265 from the date the wages or payment should have been received, had payment been made in a timely manner. In addition, the Labor Commissioner may bring any legal action necessary to recover twice the full amount of unpaid wages, payments due to an employee welfare fund or arbitration award, and the employer shall be required to pay the costs and such reasonable attorney's fees as may be allowed by the court. The commissioner shall distribute any wages, arbitration awards or payments due to an employee welfare fund collected pursuant to this section to the appropriate person."

of Barbur pursuant to General Statutes §§ 34-207[7] and 34-208.[8] The trial court found in favor of the plaintiff on his unpaid wages claim, awarded the plaintiff double damages pursuant to § 31-72 and ordered a dissolution and winding up of Barbur pursuant to §§ 34-207 and 34-208. On appeal, the defendants claim that the trial court improperly (1) invoked § 31-72 in awarding wages to the plaintiff because the plaintiff was not an "employee" of Adco within the meaning of § 31-72, (2) calculated the amount of wages awarded to the plaintiff for 2004 by failing to prorate the plaintiff's salary on the basis of the number of months that he had worked in that year, (3) awarded double damages to the plaintiff pursuant to § 31-72, and (4) ordered the dissolution of Barbur. The plaintiff responds that the trial court properly (1) found that the plaintiff was an employee of Adco and that the defendants' argument to the contrary stems from their misinterpretation of § 31-72, (2) calculated the wages awarded to the plaintiff on the basis of the evidence adduced at trial, (3) awarded double

---

[7] General Statutes § 34-207 provides: "On application by or for a member, the superior court for the judicial district where the principal office of the limited liability company is located may order dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with the articles of organization or operating agreement."

[8] General Statutes § 34-208 provides: "(a) Except as otherwise provided in writing in the operating agreement, the business and affairs of the limited liability company may be wound up (1) by the members or managers who have authority pursuant to section 34-140 to manage the limited liability company prior to dissolution or (2) on application of any member or legal representative or assignee thereof, by the superior court for the judicial district where the principal office of the limited liability company is located, if one or more of the members or managers of the limited liability company have engaged in wrongful conduct, or upon other cause shown.

"(b) The persons winding up the business and affairs of the limited liability company may, in the name of, and for and on behalf of, the limited liability company: (1) Prosecute and defend suits; (2) settle and close the business of the limited liability company; (3) dispose of and transfer the property of the limited liability company; (4) discharge the liabilities of the limited liability company; and (5) distribute to the members any remaining assets of the limited liability company."

damages on the basis of its findings of fact, and (4) ordered the dissolution of Barbur because it was not reasonably practicable for the parties to carry on the business together. We affirm the judgment of the trial court.

The trial court's memorandum of decision and the record reveal the following relevant facts and procedural history. The plaintiff and Firtel began a profitable business relationship and a strong personal friendship in the mid-1980s. Prior to Firtel's involvement with the plaintiff, Firtel had formed Adco, a pharmaceutical sales company, as a Connecticut corporation in or about 1970. Firtel was the sole owner of Adco. Prior to the plaintiff's involvement with Firtel, the plaintiff had been employed as a sales representative for a medical supply company known as General Medical Corporation, where he had obtained extensive training and sales experience.

In 1986, following a successful initial joint venture, the plaintiff and Firtel sought to formalize their business relationship. The plaintiff joined Adco and obtained a 49 percent shareholder interest in the company, and Firtel retained a controlling 51 percent interest. In September, 1986, the plaintiff and Firtel executed a document entitled "Operational Agreement Regarding Adco Corporation," which was signed by Firtel as president of Adco and by Firtel and the plaintiff, individually. The agreement provided that the plaintiff "desire[d]" to become a stockholder of Adco, "and to be employed by [Adco] . . . ."

Paragraph eight of the agreement set forth the respective duties of the parties and the compensation that they would receive. That paragraph provides in relevant part: "The parties agree that they shall each devote such of their time and efforts to the business of [Adco] as shall be reasonably necessary. [The plaintiff] acknowl-

edges, understands and agrees that Firtel may and shall spend considerable time and often for extended periods away and apart from the business of [Adco], and hereby waives any objections thereto. Each of Firtel and [the plaintiff] shall receive an equal combination of compensation and fringe benefits as the [b]oard of [d]irectors shall from time to time determine. . . ."

The agreement also assigned control of the board of directors to Firtel, through an appointment process, which provided: "There shall be a [b]oard of [d]irectors initially consisting of Firtel and [the plaintiff]. PROVIDED, HOWEVER, the parties agree that Firtel may elect to increase the number of directors to three . . . in which event two . . . of said [d]irectors shall be selected by Firtel and one . . . of said [d]irectors shall be selected by [the plaintiff]."

Following the execution of the agreement, Firtel continued to hold the position of president of Adco, and the plaintiff was appointed vice president and secretary.[9] From 1986 through July, 2004, the plaintiff was "in charge of virtually all of Adco's day-to-day operations." During each of the years between 1986 and 2003, Adco paid expenses incurred by both Firtel and the plaintiff, in addition to their salaries.[10] These expenses included medical and health expenses, automobile expenses, professional services and other related expenses.

Sometime after 2000, the plaintiff became disenchanted with the business arrangement. In March, 2003,

[9] The trial court's memorandum of decision does not specifically state the plaintiff's employment title, but the record reflects that the defendants admitted in their amended answer filed December 11, 2007, that the plaintiff was appointed to the position of vice president and secretary.

[10] The trial court's memorandum of decision provides that, "[d]uring each of the years between 1986 and 2004, Adco paid expenses incurred by both Firtel and [the plaintiff], in addition to their salaries." Because the present case involves the plaintiff's claim for unpaid wages in 2004, and the court's decision subsequently provides that the plaintiff "received no salary for 2004," it is clear that the reference to 2004 is incorrect, and should be "2003."

the plaintiff sought a change in the operational agreement stemming from his perception that he was performing most of the work necessary to guarantee a profit for Adco but was dividing compensation and fringe benefits equally with Firtel. The plaintiff submitted a proposal, suggesting that he be paid 50 percent of the income for running the business and that the next 50 percent be equally divided between the shareholders. Firtel did not engage in any meaningful discussions concerning this suggested change because, apparently, he was satisfied with the status quo.

On May 19, 2004, the plaintiff, through his attorney, formally advised Firtel that operating Adco in accordance with the 1986 agreement no longer was acceptable. The plaintiff offered to submit the dispute to arbitration and indicated an intention to file an action seeking to terminate the business relationship if an agreement could not be reached. Two months later, Firtel, acting in his capacity as president and majority stockholder of Adco, responded by terminating the plaintiff's employment via a July 23, 2004 memorandum. The plaintiff did not perform any work for Adco after July, 2004. He received no salary from Adco in 2004, and since the July 23, 2004 memorandum, the plaintiff has not been compensated by Adco either in the form of salary or most fringe benefits.

Meanwhile, in July, 1999, during what the trial court referred to as their "era of good feeling," the plaintiff and Firtel had formed Barbur, a limited liability company in which each owns a 50 percent interest. Barbur owns certain real estate located in Hamden, where Adco conducts its business. Barbur leases its property to Adco pursuant to an oral month-to-month lease. Prior to 2004, Adco paid Barbur an annual rent of $18,000. The lease obligated Adco to pay taxes, insurance and maintenance on the property.

After July, 2004, when Firtel terminated the plaintiff's employment with Adco, Firtel reduced the rental payments without consulting the plaintiff. In addition, Firtel unilaterally authorized the repair of the floor of the premises at a cost of $8480 and arranged for a $5000 loan from Barbur to Adco. Firtel continues to manage Barbur and to maintain Barbur's finances. In the aftermath of the May 19, 2004 and July 23, 2004 exchanges between the parties, any business or personal relationship that formerly had existed between them ended.

Following the plaintiff's termination from Adco, he initiated the three actions that later were consolidated for trial. The first action included, inter alia, his statutory claim for unpaid wages.[11] The second action sought the judicial dissolution of Barbur[12] and the third action, which is not at issue in this appeal, consisted of a summary process action commenced by the plaintiff on behalf of Barbur against Adco. The trial court found in favor of the plaintiff on his unpaid wages claim, awarded him double damages pursuant to § 31-72 and ordered a dissolution and winding up of Barbur pursuant to §§ 34-207 and 34-208. This appeal followed. See footnote 1 of this opinion. Additional facts will be set forth as necessary.

I

The defendants first claim that the trial court improperly awarded wages to the plaintiff pursuant to § 31-72.

[11] The plaintiff initiated the first action, both individually and derivatively on behalf of Adco and Barbur, against Burton Firtel, Norma Firtel and Adco. The operative complaint in the first action included eighteen causes of action on behalf of the plaintiff, comprised of claims for breach of contract, failure to pay wages, tortious interference with a contract, breach of fiduciary duty, usurpation of corporate opportunity, violation of the Connecticut Unfair Trade Practices Act, breach of agreement to pay rent, theft, conversion, unjust enrichment and a claim for accounting.

[12] The plaintiff commenced the second action, solely in his individual capacity, against Firtel and Barbur.

The defendants make three arguments with respect to this claim. First, the defendants argue that the trial court improperly invoked § 31-72 in awarding wages to the plaintiff because the plaintiff was not an "employee" of Adco within the meaning of § 31-72. Second, the defendants contend that the trial court improperly calculated the base amount of wages awarded to the plaintiff for 2004 by failing to prorate the plaintiff's award on the basis of the number of months that he had worked in that year. Finally, the defendants assert that the trial court's award of double damages to the plaintiff pursuant to § 31-72 was improper because that court did not make a specific finding of bad faith on the part of Adco.[13] We disagree with the defendants' first two arguments and decline to reach the third argument because the record is inadequate for our review.

A

The defendants first claim that General Statutes § 31-58 (f)[14] provides the applicable definition of the term "employee" as that term is used in § 31-72, and that the plaintiff does not come within that definition. Specifically, the defendants contend that, because the plaintiff was an officer of Adco and was "running the company," the plaintiff was "an individual employed in a bona fide executive, administrative or professional capacity," and, therefore, he is excluded from the definition of "employee" contained in § 31-58 (f). On the basis of

---

[13] We note that the plaintiff's brief addresses the issue of whether the money awarded to him constitutes "wages" within the meaning of § 31-72 because Adco employees were paid an annual salary, and that this issue was discussed briefly at oral argument before this court. Because the defendants did not properly raise or discuss this issue in their brief, however, we decline to address it.

[14] General Statutes § 31-58 (f) provides in relevant part: " 'Employee' means any individual employed or permitted to work by an employer but shall not include . . . an individual employed in a bona fide executive, administrative or professional capacity as defined in the regulations of the Labor Commissioner . . . ."

this reasoning, the defendants argue that the trial court improperly invoked § 31-72 in awarding wages to the plaintiff. The plaintiff responds that General Statutes § 31-71a, and not § 31-58 (f), provides the applicable definition of " '[e]mployee' " as that term is used in § 31-72, and that he squarely falls within this definition. We agree with the plaintiff.

This claim "raises a question of statutory construction, which is a [question] of law, over which we exercise plenary review." (Internal quotation marks omitted.) *Weems* v. *Citigroup, Inc.*, 289 Conn. 769, 778, 961 A.2d 349 (2008); see also *R.C. Equity Group, LLC* v. *Zoning Commission*, 285 Conn. 240, 248, 939 A.2d 1122 (2008) ("[b]ecause the interpretation of a statute, as well as its applicability to a given set of facts and circumstances, involves a question of law . . . our review . . . is plenary" [internal quotation marks omitted]). "The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . .

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine [the] meaning [of a statute], General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Weems* v. *Citigroup, Inc.*, supra, 289 Conn. 778–79; see also *State* v. *Marsh & McLennan Cos.*, 286 Conn. 454, 464–65, 944 A.2d 315 (2008).

The statutory provisions relevant to this claim are set forth in chapter 558 of the General Statutes. Section 31-72 is contained in part II of chapter 558 and provides in relevant part that, "[w]hen any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive, or fails to compensate an employee in accordance with section 31-76k . . . such employee . . . may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorney's fees as may be allowed by the court . . . ." Although the term "employee" is not defined in § 31-72, the statute specifically references § 31-71a, which also is contained in part II of chapter 558 and defines "employee" as "any person suffered or permitted to work by an employer . . . ."

The defendants claim that, even though § 31-72 explicitly references § 31-71a, the applicable definition of "employee" is found in § 31-58 (f). Section 31-58 is contained in part I of chapter 558, which is entitled "Minimum Wages" and provides in relevant part: "As used *in this part* . . . (f) '[e]mployee' means any individual employed or permitted to work by an employer but shall not include . . . an individual employed in a bona fide executive, administrative or professional capacity as defined in the regulations of the Labor Commissioner . . . ." (Emphasis added.)

After comparing the statutory language and the chapters in which the statutory provisions are located, we conclude that § 31-72 unambiguously indicates that the definitions contained in § 31-71a should be applied when construing § 31-72. Further, § 31-58 specifically limits the applicability of its definitions to terms "used in this part . . . ." Therefore, the definitions contained in § 31-58 apply only to part I of chapter 558 and not to § 31-72, which is found in part II. Finally, in comparing the broad language in the definition of "employee" in § 31-71a with the more restrictive language in the

definition of "employee" in § 31-58, it is evident that the legislature included limiting language to narrow the definition of an "employee" in § 31-58 but chose not to do so when defining an "employee" for purposes of § 31-71a (2). As we often have stated, when "a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed. . . . That tenet of statutory construction is well grounded because [t]he General Assembly is always presumed to know all the existing statutes and the effect that its action or [nonaction] will have upon any one of them." (Internal quotation marks omitted.) *Asylum Hill Problem Solving Revitalization Assn.* v. *King*, 277 Conn. 238, 256–57, 890 A.2d 522 (2006). We therefore reject the defendants' argument that § 31-58 provides the applicable definition of "employee" as that term is used in § 31-72 and conclude that, under the broad definition of "employee" set forth in § 31-71a, the plaintiff was an employee of Adco. Accordingly, the trial court properly invoked § 31-72 in awarding wages to the plaintiff.

B

The defendants next claim that the trial court improperly calculated the amount of wages awarded to the plaintiff for 2004 by failing to prorate the plaintiff's award on the basis of the number of months that he had worked in that year. The plaintiff responds that the trial court's calculation of wages was properly supported by the evidence adduced at trial. We agree with the plaintiff.

The following additional facts are necessary to our resolution of this claim. The trial court found that both the plaintiff's employment with Adco and the 1986 agreement were terminated on July 23, 2004, as a consequence of Firtel's memorandum to the plaintiff. The

court further found that the plaintiff's claim to receive compensation stemmed from the 1986 agreement and, therefore, that he could not claim compensation pursuant to the agreement for the period of time that he was not an Adco employee. The plaintiff received no compensation for the work that he had performed for Adco during 2004. Firtel, on the other hand, was paid $50,126 as compensation in 2004. The compensation paid to Firtel was not prorated but, rather, was disbursed in one lump sum at the end of the year. On the basis of these findings, the trial court concluded that the plaintiff "should . . . be compensated pursuant to [the agreement], for the year 2004" and awarded him $50,126 "for wages due for calendar year 2004."

We begin by setting forth our standard of review of a trial court's assessment of damages. "[A] trial court is vested with broad discretion in determining whether damages are appropriate. . . . Its decision will not be disturbed . . . absent a clear abuse of discretion." (Internal quotation marks omitted.) *Smith* v. *Snyder*, 267 Conn. 456, 466, 839 A.2d 589 (2004).

With this deferential standard in mind, we cannot conclude that the trial court abused its discretion in awarding the plaintiff wages in the amount of $50,126. The court based its calculation of damages on the agreement between the parties, which provided for equal compensation for Firtel and the plaintiff. The agreement did not provide for the proration of compensation; rather, the evidence revealed that, historically, Adco had paid Firtel and the plaintiff on an annual basis, at the end of each year. Moreover, the trial court had no basis on which it could determine how or if this annual salary could or should be prorated, as no evidence on this issue was presented at trial. Nevertheless, the trial court was cognizant that the plaintiff should not receive compensation "for the period of time during which he was not an Adco employee." In light

of the trial court's awareness of this limitation and its qualification that its award was for wages "due" for calendar year 2004, we conclude that the trial court did not abuse its discretion in awarding the plaintiff $50,126, as the award was supported by the evidence. See *Smith* v. *Snyder*, supra, 267 Conn. 467 (holding that trial court did not abuse its discretion in awarding compensatory damages when evidence, even though vague, supported award); *Metcalfe* v. *Talarski*, 213 Conn. 145, 156–57, 567 A.2d 1148 (1989) (holding that trial court's award of damages was not erroneous when supported by evidence and pleadings).

## C

The defendants also claim that the trial court improperly awarded the plaintiff double damages pursuant to § 31-72. The defendants assert that double damages under § 31-72 may be awarded only upon a finding of bad faith, arbitrariness or unreasonableness, and that such a finding "must be made by actual words" by the trial court. The defendants argue that, because the trial court did not make this explicit finding but, rather, found that the refusal of Adco to pay the plaintiff wages was "wilful," the trial court's award of double damages was improper. The plaintiff responds that the trial court's finding of wilfulness is equivalent to a finding of bad faith, and if the trial court's finding was not clear, the defendants had a responsibility to request an articulation. We conclude that the record is inadequate for our review and, therefore, decline to review this claim.[15]

Section 31-72 "provides for 'a discretionary award of double damages, with costs and reasonable attorney's fees, to employees who are successful in actions against

---

[15] Because we are not reviewing the merits of this claim, we express no opinion with respect to the plaintiff's argument that wilfulness is equivalent to bad faith for the purpose of awarding double damages pursuant to § 31-72.

their employers for wages due.' " *Ravetto* v. *Triton Tha-lassic Technologies, Inc.*, 285 Conn. 716, 724, 941 A.2d 309 (2008); see also *Crowther* v. *Gerber Garment Technology, Inc.*, 8 Conn. App. 254, 265–66, 513 A.2d 144 (1986) (affirming judgment of trial court awarding double damages and attorney's fees when employer unilaterally reduced employee's commission rate despite employment agreement). "Although § 31-72 does not set forth a standard by which to determine whether double damages should be awarded in particular cases, it is well established . . . that it is appropriate for a plaintiff to recover attorney's fees, and double damages under [§ 31-72], only when the trial court has found that the defendant acted with bad faith, arbitrariness or unreasonableness." (Internal quotation marks omitted.) *Ravetto* v. *Triton Thalassic Technologies, Inc.*, supra, 724; see also *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 269, 828 A.2d 64 (2003); *Sansone* v. *Clifford*, 219 Conn. 217, 229, 592 A.2d 931 (1991).

In the present case, the trial court's memorandum of decision is silent with respect to whether Adco acted with "bad faith, arbitrariness or unreasonableness"; *Ravetto* v. *Triton Thalassic Technologies, Inc.*, supra, 285 Conn. 724; in refusing to pay the wages due to the plaintiff. The court simply found that Adco's refusal was "wilful" and that the plaintiff should recover double damages under § 31-72. Whether a party's conduct is wilful is a question of fact. See *Bauer* v. *Waste Management of Connecticut, Inc.*, 239 Conn. 515, 527, 686 A.2d 481 (1996) ("[w]hat constitutes willfulness is a question of fact"). The term has many and varied definitions, with the applicable definition often "turn[ing] on the specific facts of the case and the context in which it is used." *Doe* v. *Marselle*, 236 Conn. 845, 851, 675 A.2d 835 (1996); *Screws* v. *United States*, 325 U.S. 91, 101, 65 S. Ct. 1031, 89 L. Ed. 1495 (1945). As we previously have observed, "Black's Law Dictionary (6th Ed. 1990)

demonstrates the varied ways that wilful has been defined ranging from 'voluntary; knowingly; deliberate . . . [i]ntending the result which actually comes to pass; designed; intentional; purposeful; not accidental or involuntary' to '[p]remeditated; malicious; done with evil intent, or with a bad motive or purpose, or with indifference to the natural consequences.'

"Additionally, we have defined the term differently depending on the context. See, e.g., *Dubay* v. *Irish*, 207 Conn. 518, 533, 542 A.2d 711 (1988) (wilful misconduct requires design to injure); *DeMilo* v. *West Haven*, 189 Conn. 671, 678–79, 458 A.2d 362 (1983) (wilful destruction of bridge means intentional destruction of bridge and intent to cause injury); *State* v. *Gotsch*, 23 Conn. Sup. 395, 398–99, 184 A.2d 56 (1962) (wilful commonly means intentional, as opposed to accidental, but in penal statute it means with evil intent); *Guest* v. *Administrator*, 22 Conn. Sup. 458, 459, 174 A.2d 545 (1961) (wilful breach of rule means deliberate violation done purposely with knowledge as opposed to result of thoughtlessness or inadvertence)." *Doe* v. *Marselle*, supra, 236 Conn. 851–52 n.8. The term wilful also has been described as including "not only the mere exercise of the will in failing to comply with the statute [in question], but also an intention to do an act that he knows, or ought to know, is wrongful or forbidden by law . . . ." Ballentine's Law Dictionary (3d Ed. 1969).

Correspondingly, the term wilful has been used to describe conduct deemed highly unreasonable or indicative of bad faith. See *CFM of Connecticut, Inc.* v. *Chowdhury*, 239 Conn. 375, 395, 685 A.2d 1108 (1996) ("[t]o determine whether the bad faith exception applies, the court must assess whether there has been substantive bad faith as exhibited by, for example, a party's . . . wilful violations of court orders" [internal quotation marks omitted]), overruled in part on other grounds by *State* v. *Salmon*, 250 Conn. 147, 154–55, 735

A.2d 333 (1999); *ACMAT Corp.* v. *Greater New York Mutual Ins. Co.*, 282 Conn. 576, 591–92 n.13, 923 A.2d 697 (2007) (same); *Matthiessen* v. *Vanech*, 266 Conn. 822, 833, 836 A.2d 394 (2003) ("While we have attempted to draw definitional distinctions between the terms wilful, wanton or reckless, in practice the three terms have been treated as meaning the same thing. The result is that [wilful], wanton, or reckless conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." [Internal quotation marks omitted.]).

Because the term wilful is subject to multiple meanings, we cannot ascribe to the trial court a particular definition of wilful as used in its memorandum of decision. Reviewing some of the court's explicit findings, we conclude that it is likely that the court used the term to mean highly unreasonable, but it also is possible that it used the term in a more benign sense. We can state, however, that the trial court did not articulate a legal standard when it made the factual finding that Adco's failure to pay wages was "wilful." It is unclear, therefore, from the court's memorandum of decision, whether the court implicitly found bad faith, arbitrariness or unreasonableness in awarding the plaintiff double damages[16] or whether the court incorrectly applied a different standard in making its award.[17]

---

[16] Although we express no opinion with respect to any particular finding, it is possible that certain of the trial court's explicit findings could support an inference of bad faith on the part of Adco.

[17] The concurring and dissenting opinion contends that the trial court's use of the term wilful indicates that it "must have measured Adco's conduct by an incorrect legal standard that does not support its award of double damages pursuant to § 31-72." We disagree. The trial court stated: "It is further *found* that the refusal of Adco to pay wages was wilful, and that [the plaintiff] shall recover twice the full amount of such wages, of $100,252." (Emphasis added.) Thus, the court was making a finding of fact and not stating a legal standard. We cannot conclude that the trial court applied an incorrect legal standard when it was the *conduct* of Adco that the court was describing. As we have noted in this opinion, it is the description of

"Our role is not to guess at possibilities . . . but to review claims based on a complete factual record developed by a trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court . . . any decision made by us respecting [the defendants' claims] would be entirely speculative." (Internal quotation marks omitted.) *State* v. *Canales*, 281 Conn. 572, 583–84, 916 A.2d 767 (2007). "Under these circumstances, the [defendants] should have filed a motion for articulation to preserve an adequate record for review. See Practice Book §§ 61-10[18] and 66-5."[19] *Stone-*

this conduct that requires articulation because of the multiple meanings ascribed to the word wilful in our case law.

Furthermore, the concurrence and dissent's suggestion that the trial court applied the wrong legal standard is belied by the next sentence in the trial court's memorandum of decision, in which that court stated: "The award of double damage[s], or attorney's fees is a matter of discretion. *Commissioner of Labor* v. *Wall*, 69 Conn. App. 450, 461, 794 A.2d 1094, cert. denied, 260 Conn. 938, 802 A.2d 90 (2002)." The pinpoint citation to *Commissioner of Labor* v. *Wall*, supra, 461, states: "[Section] 31-72 provides for the discretionary award of double damages and attorney's fees in unpaid wage cases. *Our case law has established that such an award is appropriate where there is evidence of bad faith, arbitrariness or unreasonableness.*" (Emphasis added.) This is the exact legal standard that the concurring and dissenting opinion contends that the trial court did not apply. We see no reason to assume that the trial court applied a standard different from the standard applied in a case that was cited in its decision.

[18] Practice Book § 61-10 provides: "It is the responsibility of the appellant to provide an adequate record for review. The appellant shall determine whether the entire trial court record is complete, correct and otherwise perfected for presentation on appeal. For purposes of this section, the term 'record' is not limited to its meaning pursuant to Section 63-4 (a) (2), but includes all trial court decisions, documents and exhibits necessary and appropriate for appellate review of any claimed impropriety."

[19] Practice Book § 66-5 provides in relevant part: "A motion seeking corrections in the transcript or the trial court record or seeking an articulation or further articulation of the decision of the trial court shall be called a motion for rectification or a motion for articulation, whichever is applicable. Any motion filed pursuant to this section shall state with particularity the relief sought. . . .

"If any party requests it and it is deemed necessary by the trial court, the trial court shall hold a hearing at which arguments may be heard, evidence taken or a stipulation of counsel received and approved. The trial court may make such corrections or additions as are necessary for the proper

*Krete Construction, Inc.* v. *Eder*, 280 Conn. 672, 685, 911 A.2d 300 (2006). It is the appellant's responsibility "to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision . . . to clarify the legal basis of a ruling . . . or to ask the trial judge to rule on an overlooked matter." (Internal quotation marks omitted.) *Bingham* v. *Dept. of Public Works*, 286 Conn. 698, 704 n.5, 945 A.2d 927 (2008). In the absence of an articulation, we are unable to determine the basis for the trial court's decision.[20] Accordingly, we decline to review this claim.

## II

The defendants' final claim is that the trial court improperly ordered the dissolution of Barbur pursuant to § 34-207. The crux of the defendants' argument is that the factual circumstances in the present case do not justify the trial court's implicit factual finding that it was not reasonably practicable for the plaintiff and Firtel to carry on the business of Barbur. In support of this argument, the defendants claim that "Barbur continues to function" and that the parties have each

presentation of the issues raised or for the proper presentation of questions reserved. The trial judge shall file the decision on the motion with the appellate clerk. . . ."

[20] Following the trial court's decision, the defendants filed a document entitled "motion to reargue (including motion to correct scrivener's error)." Although the motion requested reargument of the court's decisions with respect to the law of fiduciary duties and the dissolution of Barbur, the motion was notably silent on the issue of double damages. Thus, in order to preserve an adequate record for review, the defendants should have included this issue in their motion to reargue or should have filed a motion for articulation. In failing to do so and by raising this argument for the first time on appeal, the defendants denied the trial court the opportunity to act and correct any potential errors with respect to this issue. Accordingly, we decline to review their claim. See *West Farms Mall, LLC* v. *West Hartford*, 279 Conn. 1, 27–28, 901 A.2d 649 (2006) (declining to review claim raised for first time on appeal when appellant filed motions to reargue and for articulation in trial court but failed to raise claim therein).

received equal distributions from Barbur since 2004.[21] The plaintiff contends that the trial court made a plethora of factual findings that support the court's decision to order the dissolution of Barbur. We agree with the plaintiff.

We begin with our standard of review. "[When] the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . We also must determine whether those facts correctly found are, as a matter of law, sufficient to support the judgment. . . . Although we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses . . . we will not uphold a factual determination if we are left with the definite and firm conviction that a mistake has been made. . . . In applying the clearly erroneous standard of review, [a]ppellate courts do not examine the record to determine whether the trier of fact could have reached a different conclusion. Instead, we examine the trial court's conclusion in order to determine whether it was legally correct and factually supported. . . . This distinction accords with our duty as an appellate tribunal to review, and not to retry, the proceedings of the trial court." (Citation omitted; internal quotation marks omitted.) *Wyszomierski* v. *Siracusa*, 290 Conn. 225, 237–38, 963 A.2d 943 (2009).

---

[21] In an attempt to bolster their argument, the defendants have rehashed several accusations that formed the basis of their counterclaims against the plaintiff. The trial court disposed of all of the defendants' counterclaims, rendering judgment in favor of the plaintiff on each of them. The defendants have not appealed from this judgment. Accordingly, in deciding this issue, we have disregarded all facts alleged that were not found by the trial court. See *Wyszomierski* v. *Siracusa*, 290 Conn. 225, 237–38, 963 A.2d 943 (2009).

At issue in this claim is § 34-207, which provides: "On application by or for a member, the superior court for the judicial district where the principal office of the limited liability company is located may order dissolution of a limited liability company whenever it is not reasonably practicable to carry on the business in conformity with the articles of organization or operating agreement."

Applying the appropriate standard of review, we conclude that the trial court's order of dissolution is well supported by the evidence. The trial court made the following relevant factual findings in its memorandum of decision, all of which support the conclusion that it was not reasonably practicable to carry on the business of Barbur in conformity with its 1986 agreement: (1) the plaintiff and Firtel each own 50 percent of Barbur; (2) Firtel unilaterally lowered the rental payments for the property owned by Barbur in 2004 and the years following the plaintiff's termination from Adco; (3) during this period, Firtel unilaterally arranged for a $5000 loan from Barbur to Adco, a company which he controls; (4) Firtel, acting alone, authorized the repair of the floor of the premises located on Barbur's property at a cost of $8480; (5) Firtel did not equally compensate the plaintiff for distributions made on behalf of Barbur until December, 2007, after the trial of this action had commenced; and (6) since July 23, 2004, the plaintiff and Firtel have ceased to have any business or personal relationship.[22]

After reviewing the evidence in the present case, we conclude that the trial court's findings are not clearly

---

[22] The trial court also found that the plaintiff and Firtel each made accusations against the other of theft, breach of fiduciary duty, self-dealing, larceny and other allegedly improper and felonious conduct. Such ill will between the parties is not conducive to a working business relationship. This further supports the conclusion that it was not reasonably practicable for the plaintiff and Firtel to carry on the business of Barbur.

erroneous and support its determination that it was not reasonably practicable to carry on the business of Barbur. We therefore affirm the court's order of dissolution of Barbur. See, e.g., *Chance* v. *Norwalk Fast Oil, Inc.*, 55 Conn. App. 272, 279, 739 A.2d 1275 (affirming dissolution of corporation when trial court "properly concluded that there is no more chance of breaking the deadlock between the parties in the future than there has been in the past"), cert. denied, 251 Conn. 929, 742 A.2d 361 (1999); *Krall* v. *Krall*, 141 Conn. 325, 327, 334–36, 106 A.2d 165 (1954) (upholding trial court's appointment of receiver for corporation in which parties owned 49 and 50 percent interests, when defendant conducted corporation as though he personally owned all outstanding stock and did not consult plaintiff, as either stockholder or director, about corporate matters).

The judgments are affirmed.

In this opinion NORCOTT, VERTEFEUILLE and McLACHLAN, Js., concurred.

ROGERS, C. J., concurring and dissenting. I agree with parts I A and B and part II of the majority opinion. I respectfully dissent, however, from my colleagues' conclusion in part I C that the trial court's memorandum of decision lacked clarity in setting forth the legal basis for its award of double damages.

In its memorandum of decision, the trial court awarded the plaintiff Barry Saunders[1] double damages, pursuant to General Statutes § 31-72, upon its finding "that the refusal of [the defendant Adco Medical Supplies, Inc. (Adco)][2] to pay wages was wilful . . . ." The defendants claim that the trial court applied an incor-

---

[1] See footnote 3 of the majority opinion.

[2] In addition to Adco, the defendants include Burton Firtel and Barbur Associates, LLC (Barbur). See footnote 3 of the majority opinion.

rect legal standard, wilfulness, in awarding statutory double damages and that the trial court should have applied a different standard, namely, bad faith. The plaintiff responds that the bad faith standard proposed by the defendants is the equivalent of the wilfulness standard used by the trial court.

The majority concludes that the defendants' claim is not reviewable because the record is inadequate to demonstrate which standard the trial court actually used. In reaching its conclusion, the majority declares that the trial court's memorandum of decision is ambiguous because the definition of the term "wilful" varies according to the context in which it is used, and, therefore, the trial court could have made a finding of bad faith despite using the term wilful.[3]

This court, however, has stated explicitly that, in the context of § 31-72, the bad faith standard necessary to support an award of double damages is separate and distinct from the wilfulness standard used in the context of common-law punitive damages.[4] *Harty* v. *Cantor Fitzgerald & Co.*, 275 Conn. 72, 93 n.12, 881 A.2d 139

[3] The majority states that "[w]hether a party's conduct is wilful is a question of fact." The issue before this court, however, is not whether the trial court's factual findings were clearly erroneous, which would be a factual question, but instead whether the trial court applied the facts that it found to a "wilful" or a "bad faith" legal standard. Whether the trial court chose the correct legal standard is a question of law subject to plenary review. See *Fish* v. *Fish*, 285 Conn. 24, 37, 939 A.2d 1040 (2008) (trial court's determination of proper legal standard in any given case is question of law subject to plenary review); *Cable* v. *Bic Corp.*, 270 Conn. 433, 440, 854 A.2d 1057 (2004) (whether Appellate Court correctly concluded that workers' compensation commissioner had employed relevant legal standard, even though he had not expressed standard used, presents question of law subject to plenary review). Accordingly, the majority's observation that the record in this case might support a finding of either wilfulness or bad faith, or both, lends no insight into which of those standards the trial court actually applied to the evidence in the present case.

[4] I agree that, in other contexts not involving § 31-72, we have suggested that bad faith conduct could include wilful behavior.

(2005). In light of that distinction in our case law, and the trial court's use of only the term wilful in its decision, the trial court must have measured Adco's conduct by an incorrect legal standard that does not support its award of double damages pursuant to § 31-72.[5]

Because the trial court, in awarding double damages to the plaintiff, unambiguously found that Adco wilfully refused to pay the plaintiff's wages, but failed to decide whether Adco had acted in bad faith, I would reverse the judgment of the trial court only as to its award of statutory double damages, and remand the case to that court for a determination of whether Adco's conduct demonstrated bad faith and, if so, whether statutory double damages may be awarded.

---

[5] The majority states that "[w]e cannot conclude that the trial court applied an incorrect legal standard when it was the conduct of the defendant that the court was describing . . . because of the multiple meanings ascribed to the word wilful in our case law." Because the trial court necessarily applied some legal standard to Adco's conduct and because the court describes that conduct only as wilful, it is clear to me that the standard chosen by the trial court was a wilfulness standard. Further, because this court's opinion in *Harty* v. *Cantor Fitzgerald & Co.*, supra, 275 Conn. 93 n.12, clearly limits the number of definitions attributable to the term wilful in the context of § 31-72 claims for double damages, the trial court applied an incorrect standard to Adco's conduct.